UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT CHATTANOOGA

MEGAN GAZAWAY,                          )
                                       )
    *Plaintiff*,                          )
                                       )        Case No. 1:21-cv-44
v.                                     )
                                       )        Judge Curtis L. Collier
RIMS USA LLC d/b/a RNR TIRE EXPRESS,  )        Magistrate Judge Christopher H. Steger
                                       )
    *Defendant*.                         )

# M E M O R A N D U M

Before the Court is Defendant Rims USA, LLC d/b/a RNR Tire Express's motion for
summary judgment. (Doc. 21.) Plaintiff Megan Gazaway has filed a response in opposition (Doc.
25), and Defendant has replied (Doc. 38). The matter is now ripe for review.

## I.    BACKGROUND[1]

Defendant operates retail stores selling car tires and custom wheels. (Doc. 22 at 2.) It
owns a franchise store in Chattanooga, Tennessee. (*Id.*) Plaintiff, who is a woman, worked as an
account/credit manager there from January 2018 until her termination on June 17, 2020. (*Id.*) She
reported to store manager Stephen "Andy" Norton, and Norton reported to operations manager
Ken Mashburn. (*Id.*; Doc. 25-1 at 2.) Mashburn supervised Norton, but he did not regularly visit
the Chattanooga location. (Doc. 25-1 at 3.) Plaintiff also reported to assistant managers Jerry
Heaton and Matthew Palmer. (*Id.*)

In her role as account/credit manager, Plaintiff worked in the collections department, where
she was responsible for ensuring that customers who rented equipment from Defendant remained

---

[1] Factual disputes and reasonable inferences regarding the underlying facts are presented
in the light most favorable to the nonmoving party. *See Matsushita Elec. Indus. Co., Ltd. v. Zenith
Radio Corp.*, 475 U.S. 574, 587 (1986).

current on their payment plans, which included collecting payments from customers. (Doc. 22 at 2.) Each account/credit manager has a unique username and password he or she uses to access Defendant's system where customers' sensitive financial information is stored. (*Id.* at 4.) Defendant's company policy is that employees are prohibited from processing payment on a customer's account and credit card without obtaining written authorization from the customer or unless the customer presents the card in store or calls in on a recorded line. (*Id.*) Violating this policy can result in discipline up to and including termination. (*Id.*)

During the course of her employment with Defendant, Plaintiff experienced sexual harassment by store manager Norton and assistant manager Palmer. In addition, she declares that throughout the course of her employment with Defendant, she neither solicited nor sent nude or sexually explicit photographs to any employee of Defendant, nor did she engage in a romantic or sexual relationship with any employee of Defendant. (Doc. 25-6 at 3.)

Near the beginning of her employment, Norton watched her bend over and said that he would "love to stick it in." (Doc. 25-1 at 2.) Norton also said, "You're so hot I almost can't stand to not touch you." (*Id.*) Plaintiff rebuffed his advance, to which Norton said that "he can't just control himself." (*Id.*) Norton frequently stopped Plaintiff outside of the bathroom and attempted to hug her, which she also rebuffed. (*Id.*)

On October 18, 2019, Palmer texted Plaintiff an unsolicited photograph of a female celebrity. (Doc. 32 at 2.) In the photo the celebrity's bare breasts and pubic area are visible. (*Id.*) Plaintiff reported this to Heaton. (Doc. 25-1 at 3.) After this occurred, Palmer also came up behind her and rubbed her shoulders and against her back, which Plaintiff did not want. (*Id.*) She told Heaton and Norton that Palmer subjected her to unwanted touching and comments at work. (*Id.*)

2

Norton and Plaintiff communicated through Snapchat.[2]  (*Id.*)  Starting in 2019, Norton asked in person and via Snapchat messages that Plaintiff send him photos of herself in exchange for raises, which she declined to do.  (*Id.* at 2–3.)  On October 24, 2019, Norton began sending Plaintiff photos and videos of his erect penis and videos of his wife performing sexual acts on him, including performing oral sex on his erect penis.  (*Id.* at 3; Doc. 27 at 2–3.)  Heaton, the other assistant manager, said he remembered an incident in which Norton acted like he was unzipping his pants and then thrust his hips several times at Plaintiff.  (Doc. 25-1 at 4.)

On December 18, 2019, Palmer slashed a knife at Plaintiff's neck from behind.  (*Id.* at 5.)  According to the surveillance footage captured by Defendant's security camera, the blade may have made contact with Plaintiff's hair.  (Doc. 25-8.)  Palmer also pointed the knife at the camera.  (*Id.*)  Plaintiff felt something on her neck, turned, and saw Palmer with the knife.  (Doc. 25-2 at 30–31.)  She did not realize until she viewed the surveillance footage that he had slashed at her neck with the knife.  (Doc. 25-1 at 5.)  After contacting law enforcement, Plaintiff obtained a temporary protective order against Palmer, who was then transferred to Defendant's Knoxville location, received a written warning for "carelessness," and was demoted from his assistant manager position.  (Doc. 22 at 5; Doc. 22-7 at 2.)  Norton nevertheless told Plaintiff that she would work with Palmer again once the temporary protective order expired.  (Doc. 25-1 at 5.)

Plaintiff testified in her deposition that Palmer "had done that countless amounts of times" prior to the December 18, 2019, incident.  (Doc. 25-2 at 31.)  She testified that she "had made complaints to [Norton] that [Palmer] would not stop touching the back of my hair, and [Palmer]

_____

[2] Snapchat is a social media application through which users can exchange photos, videos, and texts.  *United States v. Clayton*, 937 F.3d 630, 633 (6th Cir. 2019).  Snapchat automatically deletes messages unless they are saved by the user.  *Harness v. Anderson Cnty., Tenn.*, No. 3:18-cv-100, 2019 WL 5269095, at *2 (E.D. Tenn. Oct. 17, 2019).

wouldn't stop slapping the back of my hair or swinging his fist at the back of my hair." (*Id.*) Every time after she complained to Norton, Palmer would stop temporarily before "doing it again daily" a week or two weeks later. (*Id.*)

Plaintiff reported Norton's conduct to corporate trainer William Naylor, who she understood to be Norton's supervisor. (Doc. 25-1 at 4.) She did not have the contact information for Defendant's human resources employees; when she asked operations manager Mashburn for the contact information for someone in human resources, he said he would handle it. (*Id.*) However, the harassment continued until her termination. (*Id.* at 4–5.)

Plaintiff also reported the harassment to Mashburn and corporate employee Chris Raffo. (*Id.* at 5.) She did not have Raffo's contact information; she got his phone number by looking up his personal number using caller ID when he called the store. (Doc. 25-2 at 35.) She testified in her deposition that she did not know if there was a customer care contact line or some other way to contact upper management. (*Id.*) On January 15, 2020, Plaintiff sent an email that she called a "formal complaint" to the general information e-mail of Defendant's corporate office. (Doc. 22-7 at 5.) Mashburn forwarded this e-mail to the "solutions" department on January 16, 2020. (*Id.*) She also called Mashburn to complain about Norton's conduct. (Doc. 22-7 at 2.) On January 16, 2020, Plaintiff sent an e-mail to Mashburn following up to confirm that she can make a formal complaint against Norton's harassing conduct for the approximately two years that she had worked at Defendant's Chattanooga store. (*Id.* at 6.)

On the morning of January 17, 2020, Mashburn went to Defendant's Chattanooga location to investigate Plaintiff's complaint formally. He interviewed every staff member, including Plaintiff, Norton, accounts manager Adrienne Matthews, accounts manager Nate Jacks, sales associate Dewayne Daniel, shop technician William "Bill" Lee, shop technician Johnathan Taylor,

and shop technician Joshua Bynum.[3]  (Doc. 22-7 at 3.)  Mashburn also received the two photos Norton had sent Plaintiff.  (*Id.*)  Later that evening, he went to Defendant's Knoxville location to interview former assistant manager Palmer.  (*Id.*)  On January 18, 2020, Mashburn interviewed by phone former accounts manager Tim Wade and former sales associate Joshua Early.  (*Id.*)  Norton had fired Wade for poor performance and Early had transferred to Defendant's Charlotte, North Carolina, location.  (*Id.*)  Every employee interviewed, except for Wade and Early, also filled out a dated and signed questionnaire.  (*Id.* at 4.)  Mashburn said his investigation concluded without "any corroborating proof of [Plaintiff's] claim of sexual harassment against [Norton]."  (*Id.* at 47.) He wrote, "After lengthy discussions and interviews, [Norton] denies sending any pictures to [Plaintiff].  [Norton] denies those are pictures of him or anyone he knows.  [Norton] denies that the picture is of his wife.  [Norton] denies that he has sexually harassed [Plaintiff] in any way." (*Id.*)

However, Mashburn said his "investigation did reveal a pattern of misbehavior and misconduct on [Plaintiff's] part."  (*Id.*)  For example, accounts manager Jacks wrote that "on numerous occasions she has talked about porn, and said she wanted to sell her panties online," and he had seen her "being extremely touchy with" Heaton.  (*Id.* at 12.)  Shop technician Lee said that he once saw Plaintiff raise her shirt and flash her breasts at Heaton at an employee outing.  (*Id.* at 21.)  Palmer wrote, "[Plaintiff] made comments to me that she is a whore."  (*Id.* at 33.)  Mashburn concluded that except for two of the shop technicians, "everyone reported having similar experiences with [Plaintiff] to some degree," including having "had accusations against them that were made by [Plaintiff]."  (*Id.*)

_____

[3] Although it is not apparent from the record, it appears Heaton was not interviewed and was no longer employed with Defendant at the time of Mashburn's investigation.  (*See* Doc. 25-8 at 2; Doc. 22-7 at 21.)

5

In 2020, Plaintiff did not receive a merit-based pay increase, bonus, or promotion. (Doc. 25-1 at 6.) She testified in her deposition that she did not receive a promotion despite being promised one in the year prior to her termination, nor did she receive a raise. (Doc. 25-2 at 14.) On April 10, 2018, she had received a merit-based raise from eleven dollars an hour to twelve dollars an hour. (Doc. 25-7 at 3.) On April 29, 2019, she had received a merit-based raise from thirteen dollars an hour to fourteen dollars an hour. (*Id.* at 2.) Pay increases and promotions had to be approved by Norton, Mashburn, and the company president. (Doc. 25-1 at 7; Doc. 25-7 at 2, 3.)

On February 13, 2020, Plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") against Defendant. (Doc. 25-1 at 6.) On February 20, 2020, the EEOC notified Defendant of the charge of discrimination. (Doc. 25-4 at 2.) On February 27, 2020, Plaintiff was given a written warning for "consistently demonstrat[ing] disruptive and emotional behavior in the store causing moral[4] issues among the other Associates." (Doc. 25-5 at 2.) It warned Plaintiff "to perform her assigned job duties as instructed by Management and refrain from outbursts of disruptive behavior. Any further violations may result in further disciplinary action up to, and including, termination." (*Id.*) Plaintiff refused to sign it. (*Id.*)

On June 3, 2020, Mashburn sent out a memorandum reiterating Defendant's policy regarding credit card payment authorization. (Doc. 22-5 at 34.) Employees were warned that violating the policy could result in disciplinary action up to and including termination. (*Id.*) Employees were told to print their names and sign it by the end of June 4, 2020, but Plaintiff refused to do so. (*Id.*) According to Defendant's investigation, on June 5, 2020, Plaintiff processed

---

[4] It is unclear to the Court whether this is a typographical error for "morale."

a credit card payment without the customer's authorization, without a credit card authorization on file, and the customer had not given his permission on a recorded line. (Doc. 22-10 at 2; Doc. 22-9 at 4.) Mashburn offered to refund the customer's payment, but the customer said to leave it because it had already been done. (Doc. 22-9 at 3.) Defendant determined Plaintiff had processed the payment because the transaction was processed using her system code and password, it was on the computer terminal she always used, and the surveillance footage showed her sitting at the computer terminal at the time of the transaction. (Doc. 22-9 at 4.) Defendant also interviewed every employee in the store, with each employee stating they had never used someone else's system code. (*Id.*)

On June 17, 2020, Defendant informed Plaintiff that she was terminated when she arrived at Defendant's Chattanooga location in the morning. (Doc. 22-10 at 2.) She was presented with a trespass notice, after which she left the store. (*Id.*)

On September 18, 2020, Defendant terminated Shermanita Baker, who worked at Defendant's Sumter, South Carolina, location. (Doc. 38-1 at 2.) Baker was seen running a customer's credit card that was on file that she did not have authorization to run. (*Id.*) She "ha[d] been informed multiple times by Corporate Trainer and Management that she is not to do this." (*Id.*) When asked if the customer gave her permission to run the card, she said that the customer always pays on Thursdays when the payment is late. (*Id.*) Baker was terminated for her disregard for the company policy on payment authorization. (*Id.*)

On December 17, 2020, the EEOC issued a right-to-sue notice to Plaintiff. (Doc. 1-1 at 1.) On March 8, 2021, Plaintiff brought suit against Defendant. (Doc. 1.) She alleges Defendant violated Title VII, 42 U.S.C. § 2000e-2, because she was subjected to sexual harassment that was sufficiently severe and pervasive to alter the terms and condition of her employment and created a

7

hostile work environment. (*Id.* at 7.) She also alleges Defendant violated Title VII, 42 U.S.C. § 2000e-2(a)(1), because she was discharged in retaliation for engaging in a protected activity. (*Id.* at 6.)

On August 1, 2022, Defendant moved for summary judgment, arguing that Plaintiff cannot establish a claim of retaliation as a matter of law and that Plaintiff cannot establish a claim of sexual harassment as a matter of law. (Doc. 21 at 1.) Defendant also asserts its affirmative defense to employer liability for sexual harassment. (*Id.*) On August 30, 2022, Plaintiff responded in opposition, arguing that the only issues presented by Defendant's summary-judgment motion were issues of disputed material facts. (Doc. 25 at 1.) On September 7, 2022, Defendant replied, arguing that Plaintiff has not established any genuine issues of material facts, relying "solely on self-serving, immaterial facts." (Doc. 38 at 1.)

## II.    STANDARD OF REVIEW

Summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the burden of showing no genuine issue of material fact remains. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Leary v. Daeschner*, 349 F.3d 888, 897 (6th Cir. 2003).

If the moving party meets its initial burden, "the non-moving party must go beyond the pleadings and come forward with specific facts to demonstrate that there is a genuine issue for trial." *Chao v. Hall Holding Co., Inc.*, 285 F.3d 415, 424 (6th Cir. 2002). A genuine issue for trial exists if there is "evidence on which the jury could reasonably find for the plaintiff." *Rodgers v. Banks*, 344 F.3d 587, 595 (6th Cir. 2003) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)) (internal quotations omitted). In addition, should the nonmoving party fail to provide

evidence to support an essential element of its case, the movant can meet its burden by pointing out such failure to the court. *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989).

At summary judgment, the court's role is limited to determining whether the case contains sufficient evidence from which a jury could reasonably find for the nonmovant. *Anderson*, 477 U.S. at 248–49. The court should view the evidence, including all reasonable inferences, in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Nat'l Satellite Sports, Inc. v. Eliadis, Inc.*, 253 F.3d 900, 907 (6th Cir. 2001). If the court concludes, based on the record, that a fair-minded jury could not return a verdict in favor of the nonmovant, the court should grant summary judgment. *Anderson*, 477 U.S. at 251–52; *Lansing Dairy, Inc. v. Espy*, 39 F.3d 1339, 1347 (6th Cir. 1994).

## III.  DISCUSSION

Defendant moves for summary judgment as to both of Plaintiff's claims. The Court first turns to Plaintiff's hostile work environment claim under Title VII, then to her retaliation claim under Title VII.

### A.  Sexual Harassment Under Title VII

Title VII of the Civil Rights Act of 1964 prohibits an employer from discriminating against any individual because of such individual's gender. *Williams v. Gen. Motors Corp.*, 187 F.3d 553, 560 (6th Cir. 1999) (quoting 42 U.S.C. § 2000e–2(a)(1)). "A plaintiff may establish a violation of Title VII by proving that the discrimination based on sex created a hostile or abusive work environment," which occurs where "the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive work environment." *Williams*, 187 F.3d at 560. To prevail on a prima facie hostile work environment claim, a plaintiff must show: (1) he or she was a member

9

of a protected class; (2) he or she was subjected to unwelcome harassment; (3) the harassment complained of was based on sex; (4) the charged harassment created a hostile work environment; and (5) the employer is liable. *Wyatt v. Nissan North Am., Inc.*, 999 F.3d 400, 411 (6th Cir. 2021); *Smith v. Rock-Tenn Services, Inc.*, 813 F.3d 298, 307 (6th Cir. 2016).

"[H]arassment based on sexual desire is harassment based on sex." *Nathan v. Great Lakes Water Auth.*, 992 F.3d 557, 566 (6th Cir. 2021) (citing *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80 (1998)). A hostile work environment occurs "[w]hen the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993). There is an objective prong—the conduct must be severe or pervasive enough to create an environment that a reasonable person would find hostile or abusive—and a subjective prong—the victim must subjectively regard that environment as abusive. *Bowman v. Shawnee St. Univ.*, 200 F.3d 456, 463 (6th Cir. 2000) (citing *id.* at 21–22.). When assessing whether the alleged harassment is sufficiently severe or pervasive enough to constitute a hostile work environment, the court must consider the totality of the circumstances by considering the environment as a whole rather than focusing on individual acts of alleged hostility. *Bowman*, 200 F.3d at 456 (citing *Williams*, 187 F.3d at 562–63). Isolated incidents do not amount to discriminatory changes in the terms or conditions of employment unless they are extremely serious. *Bowman*, 220 F.3d at 463 (citing *Morris v. Oldham Cnty. Fiscal Ct.*, 201 F.3d 784, 790 (6th Cir. 2000)).

Employers have an affirmative duty to prevent sexual harassment by supervisors. *Williams*, 187 F.3d at 561. "Once an employee has established actionable discrimination involving 'no tangible employment action,' an employer can escape liability only if it took reasonable care

10

to *prevent and correct* any sexually harassing behavior." *Id.* (internal citations omitted) (emphasis in original). An employer is vicariously liable for an actionable hostile work environment created by a supervisor with immediate or successively higher authority over the employee. *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 765 (1998).

An employer may raise an affirmative defense to liability, subject to proof by a preponderance of the evidence. *Ellerth*, 524 U.S. at 765. The employer must show "that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior" and "that the plaintiff unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." *Id.* Generally, an employer satisfies the first prong when it has promulgated and enforced a sexual harassment policy. *Thornton v. Fed. Express Corp.*, 530 F.3d 451, 456 (6th Cir. 2008). "[A]n effective harassment policy should at least: (1) require supervisors to report incidents of sexual harassment; (2) permit both informal and formal complaints of harassment to be made; (3) provide a mechanism for bypassing a harassing supervisor when making a complaint; and (4) provide for training regarding the policy." *Id.* (quoting *Clark v. United Parcel Serv., Inc.*, 400 F.3d 341, 349–50 (6th Cir. 2005)). For the second prong, "an employee's subjective fears of confrontation, unpleasantness or retaliation do not alleviate the employee's duty under *Ellerth* to alert the employer to the allegedly hostile environment." *Thornton*, 530 F.3d at 457 (quoting *Williams v. Missouri Dep't of Mental Health*, 407 F.3d 972, 977 (8th Cir. 2005)).

Here, the parties dispute whether the alleged harassment created a hostile work environment and whether Defendant is liable as an employer.

After reviewing the evidence in the light most favorable to Plaintiff, the Court concludes that Plaintiff has presented sufficient facts such that a reasonable jury could conclude she was

subjected to unlawful sexual harassment. There is also a genuine dispute of material fact as to whether Defendant may successfully establish its affirmative defense to employer liability. The Court will first address Plaintiff's prima facie case, then Defendant's affirmative defense.

### 1. Hostile Work Environment

Defendant argues that Plaintiff cannot establish a prima facie case of sexual harassment because she cannot establish the existence of a hostile work environment. (Doc. 22 at 16–17.) Defendant argues that neither Norton's conduct nor Palmer's conduct had a tangible impact on Plaintiff's working conditions, wages, or employment status. (*Id.*)

Regarding Norton, Defendant states that Norton "adamantly denies" sending the lewd pictures or videos through Snapchat. (*Id.* at 18.) Mashburn was also told that there are ways for people to impersonate others online, like by using iPhone apps that can create fake contact names and send texts and Snapchat messages or images. (*Id.*) Moreover, Defendant contends that Plaintiff's "own behavior in the workplace" precludes Norton's behavior from being deemed subjectively severe or pervasive. (*Id.* at 19.) Defendant's investigation into Plaintiff's January 2020 complaint revealed an alleged pattern of misbehavior and inappropriate conduct that made other employees uncomfortable. (*Id.*) Additionally, Norton declared that Plaintiff had sent lewd and explicit photos of herself to him on Snapchat and remarked that although she had sent many photos, he had failed to send any back. (*Id.* at 19–20.) Norton also declared that Plaintiff had shown sexual pictures and videos to him and other employees while at work. (*Id.* at 20.) Thus, Defendant argues that Plaintiff's alleged behavior "dispels any notion that [Plaintiff] subjectively regarded the environment as abusive." (*Id.*) Defendant also submits that employees who were interviewed during the January 2020 investigation stated they had not witnessed Norton make

inappropriate or sexist comments or send or request lewd pictures to any of Defendant's associates. (*Id.*)

Regarding Palmer, Defendant argues that the December 18, 2019, knife incident did not rise to the level of creating a sexually hostile work environment. (*Id.* at 20.) Not only was there no indication that Palmer's conduct had to do with Plaintiff's sex or that it was sexual in nature, but also Palmer was removed from Defendant's Chattanooga location, so he did not work with Plaintiff after the encounter. (*Id.*) Defendant argues Palmer's conduct was neither objectively nor subjectively severe or pervasive; it cites Plaintiff's deposition where she testified that she did not know what had touched her neck prior to viewing the surveillance footage. (*Id.*)

Plaintiff responds that she has marshaled facts supporting each element of her sexual harassment claim sufficient to survive summary judgment. (Doc. 25-1 at 10.) Plaintiff argues that Norton and Palmer "are both ostensibly heterosexual males as demonstrated by their propensity to make sexualized comments and threats to and about women." (*Id.*) She emphasizes Norton's alleged repeated sexual propositions to Plaintiff in person and digitally. (*Id.* at 10–11.) She argues that a jury could find that when viewing the totality of the circumstances, the behavior by Norton and Palmer, both of whom were Plaintiff's supervisors, constituted a hostile work environment. Norton told Plaintiff he "would love to stick it in," "almost can't stand to not touch [her]," and he "can't control himself." (*Id.* at 11.) He sent her an unsolicited Snapchat of his erect penis and an unsolicited Snapchat of his wife performing oral sex on his erect penis. (Doc. 27.) Norton waited for Plaintiff outside of the bathroom door and attempted to hug her when she came out. (Doc. 25-1 at 11.) Likewise, Palmer commented to Plaintiff that he was attracted to her appearance, rubbed her shoulders and back, and made a slashing motion with a pocketknife at Plaintiff's head. (*Id.* at 11–12.) Palmer also sent her an unsolicited text message with a full-frontal nude photo of a

woman. (Doc. 32.) Therefore, Plaintiff argues, a reasonable person would find the harassment to be severe and pervasive, and a reasonable woman would find the repeated harassment to be subjectively severe and pervasive. (Doc. 25-1 at 12.)

Defendant replies that Plaintiff's "threadbare, conclusory allegations are insufficient to support [her] claims of a hostile work environment given the totality of the circumstances, especially in light of her own behavior." (Doc. 38 at 5.) Citing *Baugham v. Battered Women, Inc.*, 211 F. App'x 432, 438 (6th Cir. 2006), Defendant argues that sporadic abusive language, gender-related jokes, and occasional teasing do not constitute a hostile work environment. (*Id.*) Defendant also contests the authenticity of the text message and Snapchat messages, arguing Plaintiff has not offered authenticated evidence and Norton declared he never sent Plaintiff any lewd pictures or videos. (*Id.*) Defendant reiterates that none of the alleged conduct had a tangible impact on Plaintiff's working conditions, wages, or employment status, given that Plaintiff "bragged" in her response in opposition that she received top scores on her performance evaluation months prior to her termination. (*Id.*) Citing this Court's decision in *Chapman v. AmSouth Bank*, No. 1:04-cv-237, 2005 WL 3535150 (E.D. Tenn. Dec. 22, 2005), Defendant argues that Plaintiff herself contributed to a hostile work environment by discussing her sex life generally and her sex life with her husband. (*Id.* at 6.) Plaintiff's coworkers stated that she had talked about pornography, wanting to sell her panties online, having sex with "girls," her open relationship with her husband, marital problems, and a sex tape she made with one of Defendant's former employees. (*Id.*) They also stated she had sent sexual photos and once, at a company outing, lifted her shirt to flash her breasts at a supervisor. (*Id.*) Therefore, Defendant argues, Plaintiff failed to establish a prima facie case of sexual harassment. (*Id.* at 7.)

14

The parties first dispute whether Norton and Palmer's alleged conduct was welcomed by Plaintiff. By definition, if the conduct is welcomed, it is not unlawful sexual harassment. *Lauro v. Tomkats, Inc.*, 9 F. Supp. 2d 863, 872 (M.D. Tenn. June 18, 1998). Defendant submits statements from Plaintiff's coworkers about her conduct at work, with the implication that Plaintiff's own conduct meant that she welcomed Norton's and Palmer's alleged sexual conduct. But Plaintiff testified at her deposition that she did not welcome Norton's and Palmer's alleged sexual conduct. She testified that Palmer "would flirt with me and hit on me and tell me I looked pretty and my hair was pretty almost daily, but I would refuse his advances." (Doc. 25-2 at 12.) Palmer "would come up behind me and rub my shoulders or like rub against the back of me some, just touch me and unwanting [sic]. I did not want him to touch me. He's a very unhygienic man." (*Id.* at 13.) Plaintiff testified regarding Norton's Snapchat videos and messages, "I told him to stop many times and he would not." (*Id.* at 25.) This is precisely the type of genuine dispute of material fact that must be submitted to the jury, not decided at the summary-judgment stage.

Next, after reviewing the evidence in the light most favorable to Plaintiff, the Court finds there is a genuine dispute of material fact as to whether Norton's and Palmer's conduct arose to the level of creating a hostile work environment prohibited by Title VII. Although it is true that Title VII does not serve as a general code of civility for the workplace, it does require courts to look at the "accumulated effect" of individual instances of sexual harassment to determine whether a hostile environment is created. *Williams*, 187 F.3d at 563. Plaintiff testified in her deposition that she had experienced approximately two years of sexual comments and physical touching from Norton and Palmer that she did not want to receive, as well as receiving explicit sexual content from Norton and Palmer that she did not want to receive. Plaintiff declared that throughout her employment, she "did not send nude or explicit photographs to any employee of Defendant" nor

15

did she "solicit any nude or explicit photographs from any employee of Defendant." (Doc. 25-6 at 3.) She also declared that since meeting Norton, she has "never sent nude or explicit photographs to him" and she "rejected Mr. Norton's sexual advances both in person and via electronic communication." (*Id.*) At the summary-judgment stage, the Court is limited to construing the record in the light most favorable to Plaintiff.

Over the course of approximately two years and five months, Plaintiff received from two of her supervisors three explicit nude photos or videos (including one of Norton receiving oral sex), "almost daily" comments about her appearance, at least six sexually aggressive remarks, one incident where a knife was held near her neck momentarily, and three instances where Norton thrust his hips at her. (Doc. 25-1 at 11–12; Doc. 25-8 at 2.) The Court of Appeals for the Sixth Circuit has stated that the "outer limits on what conduct a reasonable person could not believe creates a hostile work environment" is set out in *Bowman*, where three counts of physically invasive conduct—including a supervisor grabbing the plaintiff's buttocks and saying she could do whatever she wanted with it—and repeated unwanted sexual advances did not constitute severe or pervasive harassment. *Nathan v. Great Lakes Water Auth.*, 992 F.3d 557, 569 (6th Cir. 2021) (quoting *Bowman*, 220 F.3d at 458–59, 464). The instances Plaintiff alleged are enough to survive summary judgment. The December 18, 2019, encounter with Palmer was physical threatening, and Palmer had previously made physical contact with her by "slapping the back of [her] hair or swinging his fist at the back of [her] hair." (Doc. 25-2 at 31.) The conduct Plaintiff allegedly experienced was physically invasive, and there were three nude messages sent. Therefore, this is unlike *Nathan*, where the plaintiff had experienced only verbal remarks and no physical contact from her alleged harassers. 992 F.3d at 569–70. And some of Norton's and Palmer's behavior toward Plaintiff occurred in front of other employees, such as Heaton or accounts manager

Matthews (who was seated next to Plaintiff during the December 18, 2019, knife incident), so they arguably had a greater impact on Plaintiff. *See id.* ("[T]he lack of an audience for these personal remarks reduces their humiliating nature."). Finally, there was "no conceivable work purpose" that could justify Norton's and Palmer's conduct. *Id.*

Moreover, it is reasonable to infer that the alleged harassment made it more difficult for Plaintiff to do her job. Plaintiff need not show that her tangible productivity declined, only that the harassment unreasonably interfered with her work performance. *Nathan*, 992 F.3d at 570. All of the harassment was perpetrated by Plaintiff's supervisors, "which would likely change a reasonable person's relationship with her supervisor and, therefore, her ability to approach her supervisor about work-related issues." *Id.* All of the verbal harassment and physical conduct occurred during work hours and in the office, so the timing and location of the harassment would have made it more difficult for a reasonable person in Plaintiff's position to fulfill her job duties. *Id.* Accordingly, the Court finds that Plaintiff has presented sufficient facts that a reasonable jury could conclude that she experienced a hostile work environment under the totality of the circumstances.

Defendant cites *Baugham v. Battered Women, Inc.*, 211 F. App'x 432 (6th Cir. 2006), to argue that Norton's and Palmer's "mere offensive utterances" do not meet the level of severe or pervasive conduct sufficient to constitute a hostile work environment. (Doc. 22 at 19.) Defendant distorts *Baugham*: in *Baugham*, the complained-about conduct was not motivated by the plaintiffs' sex. 211 F. App'x at 439. Two coworkers had engaged in "undoubtedly vulgar and wholly inappropriate" conduct in the workplace, but because they had never "direct[ed] any sexual comments or innuendos toward" the plaintiffs, the Court of Appeals held that was insufficient to overcome summary judgment. *Id.* This is unlike Norton's and Palmer's conduct, where both had

17

directed sexual comments toward Plaintiff that suggested they were motivated by sexual desire toward her. Indeed, a common way for people to express sexual desire or attraction over technology is to send a nude photo, *see United States v. Sweeney*, 711 F. App'x 263, 267 (6th Cir. 2017), which is precisely what both Norton and Palmer allegedly did. Additionally, the *Baugham* court held that the two coworkers' conduct was not sufficiently pervasive because of how infrequently they came in contact with the plaintiffs. *Id.* at 440. For example, one coworker only saw one plaintiff once a week. This is unlike here, where Plaintiff came in daily contact with Norton and Palmer at Defendant's Chattanooga office and where Plaintiff regularly electronically communicated with Norton and Palmer. (*See* Doc. 22-11 at 2.)

The Court notes finally that Defendant's analogy of Plaintiff's alleged conduct to the facts of *Chapman*, 2005 WL 3535150, is unavailing. Defendant engages with *Chapman* primarily to analogize Plaintiff's alleged conduct to that of the harasser in *Chapman*. (Doc. 38 at 6.) Plaintiff has maintained in her deposition that all of Norton's and Palmer's conduct and sexual advances were unwanted and she had not consented to their sexual conduct. So even if Plaintiff had behaved like the sexual harasser in *Chapman*, that does not justify dismissing her sexual harassment complaint at the summary-judgment stage, where all disputed facts must be taken in her favor.

### 2. Defendant's Affirmative Defense

Defendant argues it can establish its affirmative defense as an employer by a preponderance of the evidence. (Doc. 22 at 21.) Namely, Defendant has a company policy prohibiting sexual harassment, and Defendant promptly investigated Plaintiff's claims of sexual harassment after she complained to Mashburn and e-mailed Defendant's corporate e-mail on January 15, 2020. (*Id.* at 22.) Additionally, Defendant submits that corporate trainer Naylor declared Plaintiff never reported alleged harassment or inappropriate from Norton or Palmer to him. (*Id.*) Defendant states

18

this is bolstered by Plaintiff's language in her January 15, 2020, e-mail to Defendant's corporate e-mail, where she wrote, "I have been made to live in fear of losing my job so I did not let anyone know until today." (*Id.* at 23.) Thus, Defendant urges the Court to dismiss Plaintiff's sexual harassment claim because she "unreasonably failed to timely take advantage of the preventive opportunities provided by Defendant." (*Id.*)

Plaintiff responds that Defendant is liable because it did not take prompt and reasonable action in response to her complaints of harassment. (Doc. 25-1 at 14.) Plaintiff testified in her deposition that she made repeated reports to Mashburn and Naylor prior to January 2020, and she obtained a protective order against Palmer after the December 18, 2019, encounter. (*Id.*) Plaintiff also contends, "when Defendant finally decided to investigate [Plaintiff's] claims, they investigated her rather than her harassers," and the harassment continued until her termination. (*Id.*)

As an initial matter, it is unclear whether Defendant can assert its affirmative defense to vicarious liability provided by *Ellerth*, given that Plaintiff experienced a tangible employment action in the form of her termination. Neither party has raised this issue, however. In any case, the Court finds there is a dispute of material fact as to whether Defendant can assert its affirmative defense provided by *Ellerth*, which precludes summary judgment in favor of Defendant on this issue.

Because both Norton and Palmer were Plaintiff's supervisors, Defendant can only escape strict liability by showing that it exercised reasonable care to prevent and promptly correct any harassing behavior and that the plaintiff unreasonably failed to take advantage of any preventive or corrective opportunities that were provided. *Vance v. Ball St. Univ.*, 570 U.S. 421, 429–30 (2013) (citing *Faragher*, 524 U.S. at 807).

19

The second prong is dispositive, so the Court takes it up first. The Court disagrees with Defendant that Plaintiff failed to take advantage of opportunities to prevent or correct the harassment. Defendant's policy merely requires the employee to make the report or complaint "to the department head or Human Resource Manager if the complaint involves the supervisor or manager." (*Id.*) Defendant argues that Naylor wrote in his February 21, 2020, statement that Plaintiff had "never reported any alleged harassment or inappropriate behavior by Mr. Norton or Mr. Palmer to him." (Doc. 22 at 22.) But in that same statement, Naylor wrote that "[Plaintiff] also stated that she was tired of all the 'guys' in the store making inappropriate remarks to her. On both occasions I asked whom [sic] the guys where [sic], and she said almost everybody on the store including [Norton]." (Doc. 22-8 at 3.) He further writes, "on both occasions I asked what she wanted me to do about it and if she wanted to report it to Corporate, I even offered to have [human resources] call and talk to her and she stated that she didn't want me to say anything." (*Id.*) This appears to contradict Defendant's contention that Plaintiff had never told Naylor about Norton's alleged conduct toward her. Additionally, Plaintiff did complain to management while the harassment was ongoing, as evidenced by her January 15, 2020, e-mail to Defendant's general corporate e-mail. (Doc. 22-7 at 5.) Plaintiff also declared, "Each time an employee of Defendant made a comment I found sexually harassing, I reported the behavior to William Naylor as soon as I was able." (Doc. 25-6 at 4.) This genuine dispute of material fact is an issue for the jury to resolve.

This is unlike the facts of other situations where the Court of Appeals found that the employee had unreasonably failed to avail herself of corrective measures. For example, in *Collete v. Stein-Mart, Inc.*, 126 F. App'x 678, 687 (6th Cir. 2005), the employee declined to return to work after her employer terminated her harasser and she failed to call her employer's hotline that she

knew would have escalated her complaint directly to management. In *Gallagher v. C.H. Robinson Worldwide, Inc.*, 567 F.3d 263, 276 (6th Cir. 2009), the plaintiff did not "take reasonable steps to ensure her employer was actually aware of the harassment and had a chance to correct it before she left" for another company. Accordingly, a reasonable jury could find that Defendant cannot prevail on its affirmative defense under *Ellerth*.

In short, Plaintiff's sexual-harassment claim survives summary judgment. The Court will **DENY** Defendant's motion for summary judgment on Plaintiff's sexual-harassment claim under Title VII.

### B.      Retaliation Under Title VII

Plaintiff brings a claim for unlawful retaliation under Title VII. To establish a prima facie case of retaliation, a plaintiff must show:

> (1) that she engaged in activity protected by Title VII; (2) that this exercise of protected rights was known to the defendant; (3) that the defendant thereafter took adverse employment action; and (4) that there was a causal connection between the protected activity and the adverse action.

*Pittington*, 213 F. Supp. 3d at 959. To come within the protection of Title VII, a plaintiff "must establish that [s]he challenged an employment practice that [s]he reasonably believed was unlawful." *Yazdian v. ConMed Endoscopic Techs., Inc.*, 793 F.3d 634, 645 (6th Cir. 2015) (citing *Johnson v. Univ. of Cincinnati*, 215 F.3d 561, 580 (6th Cir. 2000)). Protected activity includes "a demand that a supervisor cease his/her harassing conduct," but it does not include "merely a 'vague charge of discrimination.'" *Yazdian*, 793 F.3d at 645 (first quoting *Equal Emp. Opportunity Comm'n v. New Breed Logistics*, 783 F.3d 1057, 1067 (6th Cir. 2015); then quoting *Booker v. Brown & Williamson Tobacco Co.*, 879 F.2d 1304, 1313 (6th Cir. 1989)). An employee's complaints that are too "ambiguous" and do not mention the employee's belief that she was discriminated against are insufficient to alert the employer that the plaintiff was opposing an

21

unlawful employment practice, so they do not constitute protected activity. *Yazdian*, 793 F.3d at 645. Under Sixth Circuit precedent, "a vague charge of discrimination in an internal letter or memorandum is insufficient to constitute opposition to an unlawful employment practice." *Manstra*, 2012 WL 1059950 at *10 (quoting *Fox v. Eagle Distrib. Co.*, 510 F.3d 587, 591 (6th Cir. 2007)).

An adverse "employment action constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a material change in benefits." *Ellerth*, 524 U.S. at 761. In most cases, an adverse employment action "inflicts direct economic harm." *Id.* at 762. To establish a causal connection between an adverse employment action and protected activity, "a plaintiff must produce sufficient evidence from which an inference could be drawn that the adverse action would not have been taken had the plaintiff not filed a discrimination action." *Nguyen v. City of Cleveland*, 299 F.3d 559, 563 (6th Cir. 2000) (first citing *Equal Emp. Opportunity Comm'n v. Avery Dennison Corp.*, 104 F.3d 858, 861 (6th Cir. 1997); then citing *Jackson v. RKO Bottlers*, 743 F.2d 370, 377 (6th Cir. 1984)). Although no one factor is dispositive, evidence that the employer treated the plaintiff differently from similarly situated employees or that the adverse action occurred shortly after the plaintiff's exercise of protected rights is relevant to causation. *Nguyen*, 229 F.3d at 563 (citing *Moon v. Transp. Drivers, Inc.*, 836 F.2d 226, 230 (6th Cir. 1987)). "The burden of establishing a prima facie case in a retaliation action is not onerous, but one easily met." *Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 523 (6th Cir. 2008) (quoting *Nguyen*, 229 F.3d at 563).

Next, the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for the plaintiff's adverse employment action. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792,

802 (1973). If the employer has an "honest belief" in the "nondiscriminatory basis" upon which it made its adverse employment action, then the employee cannot establish pretext. *Tingle v. Arbors at Hilliard*, 692 F.3d 523, 530–31 (6th Cir. 2012) (quoting *Majewski v. Automatic Data Processing, Inc.*, 274 F.3d 1106, 1117 (6th Cir. 2001)). Moreover, "[w]hen an employer reasonably and honestly relies on particularized facts in making an employment decision, it is entitled to summary judgment on pretext even if its conclusion is later shown to be 'mistaken, foolish, trivial, or baseless.'" *Chen v. Dow Chem. Co.*, 580 F.3d 394, 401 (6th Cir. 2009) (quoting *Clay v. United Parcel Serv., Inc.*, 501 F.3d 695, 713–15 (6th Cir. 2007)). The "key inquiry . . . is 'whether the employer made a reasonably informed and considered decision before taking' the complained-of action." *Michael v. Caterpillar Fin. Servs. Corp.*, 496 F.3d 584, 598–99 (6th Cir. 2007) (quoting *Smith v. Chrysler Corp.*, 155 F.3d 799, 807 (6th Cir. 1998)). The employer "must point to particularized facts upon which it reasonably relied." *Tingle*, 692 F.3d at 531.

If the employer carries its burden, the burden shifts back to the plaintiff to "identify evidence from which a reasonable jury could conclude that the proffered reason is actually pretext for unlawful discrimination." *Lindsay v. Yates*, 578 F.3d 407, 415 (6th Cir. 2009) (quoting *Blair v. Henry Filters, Inc.*, 505 F.3d 517, 524 (6th Cir. 2007)). A plaintiff can establish pretext either by a "direct evidentiary showing that a discriminatory reason more likely motivated the employer" or by an "indirect evidentiary showing that the employer's explanation is not credible." *Peters v. Lincoln Elec. Co.*, 285 F.3d 456, 470 (6th Cir. 2002). In other words, "a plaintiff can show pretext in three interrelated ways: (1) that the proffered reasons had no basis in fact, (2) that the proffered reasons did not actually motivate the employer's action, or (3) that they were insufficient to motivate the employer's action." *Tingle*, 692 F.3d at 530 (quoting *Romans v. Mich. Dep't of Human Servs.*, 668 F.3d 826, 839 (6th Cir. 2012)). "To avoid summary judgment, the plaintiff is

required to produce evidence that the employer's proffered reasons were factually untrue. Despite the shifting burdens of production, the ultimate burden of persuasion remains at all times with the plaintiff." *Id.*

Here, the parties dispute whether Plaintiff can establish a prima facie case of retaliation, whether Defendant's proffered reason is legitimate and nondiscriminatory, and whether Defendant's proffered reason is pretextual.

After reviewing the evidence in the light most favorable to Plaintiff, the Court agrees with Plaintiff that she has shown a close enough temporal connection between her charge of sexual harassment and her termination to permit a jury to make the inference that her termination was caused by her complaint. Although Defendant stated a legitimate, nondiscriminatory reason for Plaintiff's termination, the Court finds that Plaintiff created a genuine dispute of material fact as to whether it was pretext. The Court will take the three stages of the *McDonnell Douglas* burden-shifting framework in turn below.

### 1. Prima Facie Retaliation Case

Defendant argues that Plaintiff cannot establish a prima facie case of retaliation because she cannot establish that she experienced an adverse employment action in connection with her allegations of misconduct. (Doc. 22 at 10.) Defendant argues Plaintiff cannot point to evidence of retaliation, whether it was Norton not wanting to talk to her, her not receiving a bonus, or her not receiving a pay raise in 2020. (*Id.* at 10, 12.) Defendant says that Norton denied not talking to Plaintiff. (*Id.* at 11.) Defendant says that Plaintiff has not introduced evidence that Norton withdrew her bonus. (*Id.*) Defendant says that no one at its Chattanooga location was promised or received a pay raise between February 2020 and August 2020, the time period when Plaintiff said she was promised a raise. (*Id.* at 12.) Defendant notes that Plaintiff testified she did not recall

whether anyone received a raise in 2020. (*Id.*) Defendant argues that Plaintiff failed to provide facts suggesting a causal connection between an adverse employment action and her alleged protected activity. (*Id.*) Defendant cites *Cooper v. City of North Olmsted*, 795 F.2d 1265, 1272 (6th Cir. 1986), to argue that merely being terminated months after a complaint is insufficient to establish a causal connection. (*Id.* at 14.) Therefore, Defendant argues, Plaintiff's claim cannot survive summary judgment because conclusory statements based on nothing more than her subjective opinion are not sufficient to substantiate her case. (*Id.*)

Plaintiff responds that she can establish causation in her prima facie case. (Doc. 25-1 at 18.) She states that before filing a charge of discrimination with the EEOC, she had made several complaints about experiencing sexual harassment to her supervisors, but Defendant did not take any action. (*Id.*) However, after filing the charge of discrimination, Defendant initiated an investigation that focused on her instead of her alleged harassers. (*Id.*) Then, approximately one week after filing the charge of discrimination, Defendant gave her an "unsubstantiated, unexplained" written warning that "referred vaguely to 'moral issues.'" (*Id.* at 18–19.)

As to whether Plaintiff can establish a prima facie case of retaliation, the parties dispute only whether there is causation between the adverse employment action—her termination on June 17, 2020—and her protected activity of complaining about Norton's and Palmer's conduct toward her. Plaintiff's charge of discrimination was entered into the EEOC's system on February 20, 2020. (Doc. 25-4 at 2.) The activity log shows that one of Defendant's employees logged in and downloaded the charge that day. (*Id.*) On February 27, 2020, one week later, Plaintiff received a written warning. (Doc. 25-5 at 2.) The description of the violation reads in its entirety, "[Plaintiff] has consistently demonstrated disruptive and emotional behavior in the store causing moral issues among the other Associates." (*Id.*) The corrective action is that Plaintiff "is to perform her

assigned job duties as instructed by Management and refrain from outbursts of disruptive behavior. Any further violations may result in further disciplinary action up to, and including, termination." (*Id.*)

On June 17, 2020, Plaintiff was terminated. (Doc. 22-10 at 2.) Her termination letter provides that on June 4, 2020, she refused to sign a company policy/procedure regarding the proper use of customer credit cards. (*Id.*) Then on June 5, 2020, she processed a customer's payment using his credit card information without his authorization and without a credit card authorization on file. (*Id.*) Defendant's June 11, 2020, memo regarding the investigation into the unauthorized payment stated that the customer had not authorized anyone to run his credit card on June 5 or any other day and that he did not want to put a credit card on file or set up auto-draft. (Doc. 22-9 at 3.) The customer was offered to have the payment refunded, but "he said to leave it the way it is since it has already been done." (*Id.*) At the time all of this happened, the EEOC charge of discrimination was still pending. (*See* Doc. 1-1 at 2 (issuing notice of right to sue on December 17, 2020).)

The ambiguous written warning Plaintiff received for causing "moral issues among the other Associates" came exactly one week after she filed her charge of discrimination with the EEOC. For reference, Palmer had received a written warning on the same form for swiping a knife against Plaintiff's neck, but Palmer's was for "carelessness," while Plaintiff's was for "conduct." And although Defendant cites Plaintiff's failure to comply with the credit-card policy as the reason for her termination, it does not appear that Plaintiff had received any oral or written warnings prior to her termination, unlike Shermanita Baker, who was fired on September 18, 2020, for violating the same policy. (Doc. 38-1 at 2.) Baker "was seen running a customer's credit card that was on file, that she did not have authorization to run. She has been informed multiple times by Corporate

Trainer and Management that she is not to do this." (*Id.*) And as previously stated, Plaintiff was terminated while her EEOC charge of discrimination was pending. Therefore, a reasonable jury could find that there is a causal connection between her protected activity and her termination based on the timing of the written warning and her termination.

### 2. Defendant's Legitimate, Nondiscriminatory Reason

Defendant then argues that the only adverse employment action Plaintiff experienced was when she was terminated for violating company policy, which is a legitimate, nondiscriminatory reason. (Doc. 22 at 13.) Defendant notes that Plaintiff did not testify in her deposition that she believed she was terminated in retaliation for reporting sexual harassment, nor can she provide evidence refuting Defendant's reason for her termination. (*Id.*)

Plaintiff responds that Defendant has not offered a legitimate, nondiscriminatory reason for her termination. (Doc. 25-1 at 20.) Defendant cited an unauthorized credit card transaction and Plaintiff's refusal to sign the resulting disciplinary action as cause for her termination, but this incident was the first time she had been "accused of any wrongdoing of any kind" after two years of employment with Defendant. (*Id.*) Furthermore, the affected customer told Defendant he did not need the payment to be reversed and he indicated he was not harmed by the unauthorized payment processing. (*Id.*) Because the termination happened "in the midst" of an active EEOC investigation into Plaintiff's charge of discrimination, she argues Defendant has not met its burden. (*Id.*)

Defendant replies that it proffered a legitimate, nondiscriminatory reason for Plaintiff's termination, which is that she had violated the company's confidential-customer-information policy and its password-confidentiality agreement. (Doc. 38 at 10–11.) Defendant points to the investigation it conducted after the customer's credit card was charged and found that Plaintiff had

27

done it.  (*Id.* at 11.)  Another employee, Baker, had been terminated as well for processing a customer payment without obtaining authorization to do so.  (Doc. 38-1 at 2.)

So, the evidence shows there was no employee who had done what Plaintiff had done who was not terminated.  Therefore, the Court finds that Defendant has proffered a legitimate, nondiscriminatory reason for terminating Plaintiff.[5]

### 3.  Plaintiff's Rebuttal of Defendant's Legitimate, Nondiscriminatory Reason

Finally, Defendant argues Plaintiff cannot prove its stated reason for her termination was a pretext for retaliation.  (Doc. 22 at 15.)  Defendant's policies state that accessing a customer account and processing payment without proper authorization is a terminable offense.  (*Id.*)  Defendant states that it terminated Plaintiff because of its good faith belief that she had violated its company policies.  (*Id.*)  Citing *Majewski v. Automatic Data Processing, Inc.*, 274 F.3d 1106, 1117 (6th Cir. 2001), Defendant argues that even if its findings about Plaintiff were incorrect, that still is not evidence of pretext as long as its decision was based on its good faith belief that she had engaged in misconduct.  (*Id.* at 16.)  Defendant concludes that Plaintiff has not met her burden in rebutting its legitimate, nondiscriminatory reason for terminating her.  (*Id.*)

Plaintiff responds that she can show Defendant's proffered reason was pretext.  First, Plaintiff argues that Defendant's reason had no basis in fact.  (Doc. 25-1 at 20.)  She testified in her deposition that Defendant had told her that the times on the surveillance cameras are incorrect and are therefore unreliable; accordingly, she concludes it was improper to rely on camera footage

---

[5]  As a minor point, the Court disagrees with Defendant's contention that it is telling that during her deposition, she did not testify that she believed she was terminated in retaliation for reporting sexual harassment.  (Doc. 38 at 11.)  Plaintiff's own belief about why she was terminated is immaterial—the inquiry focuses on whether Defendant had an honest belief in the basis for her termination.  *Tingle*, 692 F.3d at 532.

of her sitting at the computer at the time of the alleged unauthorized transaction. (*Id.* at 21.) Second, Plaintiff argues that Defendant's proffered reason was insufficient to explain its actions. (*Id.*) The unauthorized transaction was the only disciplinary action Plaintiff incurred during her two-year employment with Defendant, while other employees had received at least one formal disciplinary action and had not been immediately terminated. (*Id.*) Namely, accounts manager Nate Jacks received formal discipline for repossessing a customer's tires against his supervisor's direction and was not terminated. (*Id.* at 21–22; Doc. 22-7 at 3.) Third, Plaintiff argues that Defendant's proffered reason did not motivate its actions. (*Id.* at 22.) Plaintiff cites *Hamilton v. General Electric Co.*, 556 F.3d 428, 436 (6th Cir. 2009), which states, "when an employer . . . waits for a legal, legitimate reason to fortuitously materialize, and then uses it to cover up his true, longstanding motivations for firing the employee, the employer's actions constitute the very definition of pretext." (*Id.*) Plaintiff asserts that she has at least established a material fact in dispute as to the true reason for her termination. (*Id.*)

Defendant replies that Plaintiff failed to establish pretext. (Doc. 38 at 10.) Defendant argues that "it need not prove any other conduct issues prior to discharging [Plaintiff]" for accessing a customer's payment information without prior authorization. (*Id.* at 11.) Defendant contends that Plaintiff's "personal perception of a customer's harm has nothing to do with her clear violation of an important company financial policy," and Defendant adds that the customer refused to give permission for his credit card to be run without prior authorization in the future. (*Id.* at 12.) Moreover, Defendant states that Plaintiff engaged in inappropriate workplace behavior, including inappropriate sexual behavior, that was revealed in its investigation of Plaintiff's January 2020 complaint. (*Id.* at 11.) Further, Defendant argues that Plaintiff's reliance on comparisons to other employees is unavailing because they were not similarly situated to her. (*Id.* at 13.)

29

Defendant argues, "no similarly situated employee, male or female, engaged in the same behavior for which Plaintiff received a written warning, and Plaintiff can point to no comparators who were NOT disciplined for accessing a customer's payment without prior authorization following their refusal to sign a company memorandum prohibiting that conduct." (*Id.*) Because "there is no evidence that Plaintiff was treated differently from any similarly situated male employees," Defendant argues Plaintiff failed to meet her burden in establishing that Defendant's reason for terminating her was pretextual. (*Id.*)

Defendant reiterates Plaintiff cannot rebut its legitimate, nondiscriminatory reason for her termination. Citing *Haughton v. Orchid Automation*, 206 F. App'x 524, 534 (6th Cir. 2006), Defendant urges the Court not to second-guess its business decisions and not to serve as a personnel manager. (Doc. 38 at 13.) Defendant's argument is unavailing because the Court must necessarily get involved when an employer is alleged to have violated Title VII, and nowhere has any Court of Appeals insinuated that business needs shield an employer from liability for wrongdoing. Title VII provided legal remedies because Congress recognized that it is not enough to expect employers to comply voluntarily with its antidiscrimination dictates.

In *Haughton*, the Court of Appeals rejected the plaintiff's comparison of himself to other employees who were not similarly situated based on his own subjective belief. *Id.* This is unlike here, where even Baker, the terminated employee Defendant brings up, cannot be said to have been similarly situated to Plaintiff. As previously discussed, Baker had been "informed multiple times" that she was not do that. (Doc. 38-1 at 2.) From the record as given, viewed in the light most favorable to Plaintiff, Plaintiff is not similarly situated with Baker because Baker had received multiple previous warnings about not processing a customer's payment without prior authorization, but Plaintiff had not. In her declaration, she says, "At no time during my

30

employment did I make any unauthorized credit card transactions." (Doc. 25-6 at 12.) On June 3, 2020, the employees with computer terminal access were instructed to print their name and sign that they had read a memorandum about proper credit card payment procedures (Doc. 22-5 at 34), but that is not the same as a warning administered in response to behavior violating the company's code of conduct.

A jury could reasonably find that Defendant's proffered legitimate, nondiscriminatory reason was insufficient to explain its act of terminating Plaintiff. Plaintiff declared that during the course of her employment, she was "not aware of Defendant terminating any other employee after they received a first formal disciplinary action." (Doc. 25-6 at 4.) She declared that Jacks, an account manager, "was formally disciplined after repossessing a customer's tires and was not terminated." (*Id.*) And as previously discussed, Baker was terminated for violating Defendant's policy on credit card authorization only after being "informed multiple times." (Doc. 38-1 at 2.) These comparators could plausibly undermine the credibility of Defendant's legitimate, nondiscriminatory reason.

In sum, Plaintiff's retaliation claim survives summary judgment because a reasonable jury could find that Defendant's legitimate, nondiscriminatory reasons for the adverse employment actions were pretextual. Her prima facie case of retaliation is also sufficient to survive summary judgment.

Accordingly, there are genuine disputes of material fact that must be resolved by a jury, and so the Court will **DENY** Defendant's motion for summary judgment on Plaintiff's retaliation claim.

31

## IV.    <u>CONCLUSION</u>

For the foregoing reasons, the Court will **DENY** Defendant's motion for summary

judgment (Doc. 21).

**AN APPROPRIATE ORDER WILL ENTER.**

<u>/s/                                                    </u>
**CURTIS L. COLLIER**
**UNITED STATES DISTRICT JUDGE**

32